IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAIME PORIS,

    Plaintiff and Counterclaim-Defendant,

v.

NOVELLUS SYSTEMS, INC.,

    Defendant and Counterclaimant.

No. C 10-00947 JSW

**CLAIM CONSTRUCTION ORDER**

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). This Order construes the ten claim terms selected by the parties, which appear in the patent at issue in this case, United States Patent No. RE37,749 ("the '749 Patent") called "Electrodeposition Apparatus with Virtual Anode." All disputed terms appear in the only asserted claim, Claim 3 of the '749 Patent.

## BACKGROUND

The '749 Patent, issued on June 18, 2002, is a reissued of U.S. Patent No. 5,723,028, which was issued on March 3, 1998. The patent relates to an apparatus for the processing of semiconductor wafers.

The Court shall address additional facts as necessary in the remainder of this Order.

**ANALYSIS**

**A.     Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc. v. Safari Water Filtration Sys.*, *Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-981.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods.*, *Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg.*, *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in

all cases with the actual words of the claim"). A court's final construction, therefore, must accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

The court should also look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms. *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys.*, *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

Intent to limit the claims can be demonstrated in a number of ways. For example, if the patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the disputed claim term in either the specification or prosecution history," a court will defer to that definition. *CCS Fitness*, *Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order to so limit the claims, "the patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288

F.3d at 1367. For example the presumption of ordinary meaning will give way where the "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id*. at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323.

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp*. *v*. *VIA Techs*., *Inc*., 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic*, *Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words...." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also

admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter. "The main problem with elevating the dictionary to ... prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id.* at 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

**B.    Claim Construction.**

   **1.    "a cathode wire"**

Novellus argues that the term "a cathode wire" must be construed to mean: "a wire that is woven into a cathode gasket and that makes direct contact with the electrically conducting layer of the seminconductor." (Parties' Amended, Final Joint Claim Construction and Pre-hearing Statement ("Statement"), Ex. B at 1.) Poris, on the other hand, argues that the term "a cathode wire" should be construed to mean: "a communicator of electricity which allows electrical contact to the semiconductor." (*Id.*, Ex. A at 1.) At the claim construction hearing, Poris conceded that "communicator of electricity" is too broad and agreed that the term "wire" need not be construed. Accordingly, Poris's proposed construction would read "a wire which allows electrical contact to the semiconductor."

The key distinction between the two proffered constructions is that Novellus's proposed construction imports the limitation to require that the wire be sown into the cathode gasket and that it makes direct contact with the semiconductor. With regard to the wire being sown, Novellus's proposed construction clearly attempts to import the limitations disclosed in one specific embodiment into the construction of the term. However, the limitation disclosed in the

5

specifications of this specific embodiment should not be read into the claims. "Limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary." *Teleflex*, 299 F.3d at 1326; *see also CCS Fitness*, 288 F.3d at 1366. It is only when the preferred embodiment is described in the specification as the invention itself that the construction may be so limited. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009). Because the figure indicating the wire sown into the cathode gasket is merely demonstrative of a preferred embodiment and not explicitly identified as the invention itself, the Court does not adopt the sown requirement into its construction. However, from the specifically disclosed features of the invention, it appears that the wire must be in direct contact with the semiconductor. (*See* '749 Patent at 9:13-17.)

Accordingly, the Court construes the term "a cathode wire" to mean: "a wire which allows direct electrical contact to the semiconductor."

### 2. "a cell body"

Novellus argues that the term "a cell body" should be construed to mean: "the side wall sections of the container that holds the electrolyte during electrodeposition." (Statement, Ex. B at 1.) Poris, on the other hand, argues that the term "a cell body" should be construed to mean: "a part of the electrodeposition apparatus where the electrodeposition occurs." (*Id.*, Ex. A at 2-3.)

The key distinction between the two proffered constructions is whether the term refers specifically to the side walls, as pictured in Figure 9 of the patent, or to the whole container within which the electrodeposition occurs. Although the figure depicts the cross-sectional view of the apparatus as a stacked series of elements, it is not clear that the term "cell body" refers only and exclusively to the side wall portions identified as element 10. The apparatus could be viewed from various other angles and the term cell body indicates the boundary walls, but not necessarily exclusively the side walls. However, the Court finds that Poris's proposal is too

broad as it would include all of the various parts identified in the apparatus and not just the boundary parts.

Accordingly, the Court construes the term "a cell body" to mean: "the boundary walls of the electrodeposition apparatus container where the electrodeposition occurs."

**3.     "gasket"**

Novellus argues the term "gasket" should be construed to mean: "inert, compressible material that seals the junction between a first stationary surface and a second stationary surface to prevent leakage of liquid between the two surfaces." (Statement, Ex. B at 1.) Poris argues that the term "gasket" should be construed to mean: "inert item which provides for a fluid-tight sealing relationship between two surfaces." (*Id.*, Ex. A at 4.) Both parties agree that the gasket has to be inert, but Novellus adds the further limitation that it must also be compressible and also that it seals a junction between two stationary surfaces. Nothing in the intrinsic record – neither the claims nor the specifications – address whether the gasket material must be compressible nor whether the surfaces it seals must be stationary.

Novellus argues these limitations are appropriately drawn from two extrinsic sources, an unidentified booklet entitled "An Introduction to Seals and Gaskets" as well as the McGraw-Hill Dictionary of Engineering. (*See* Opp. Br. at 19.) Technical dictionaries may help "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *See Vitronics*, 90 F.3d at 1584 n.6 (extrinsic evidence of technical treatises or dictionaries may be relied upon to assist in determining the meaning or scope of technical terms in the claims); *see also Phillips*, 415 F.3d at 1318 (citing *Teleflex*, 299 F.3d at 1325 ("Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention.")). Although the proffered construction from Poris derives from a regular dictionary and the stationary limitation from an engineering dictionary, Novellus has failed to demonstrate that the particular

7

engineering dictionary it draws from is pertinent to the art or would be known to a person of ordinary skill in the art at the time of the invention.

Accordingly, the Court construes the term "gasket" to mean: "an inert item which provides for a fluid-tight sealing relationship between two surfaces."

### 4. "a [sic] anode gasket for sealing said anode to said cell body adapted to prevent leakage of an electrolyte"

Novellus argues the term "anode gasket for sealing said anode to said cell body adapted to prevent leakage of an electrolyte" should be construed to mean: "an inert, compressible material that seals the junction between a first stationary surface that is the cell body and a second stationary surface that is the anode to prevent leakage of the electrolyte between the two surfaces to the environment external to the container that holds the electrolyte during electrodeposition." (Statement, Ex. B at 2.) Poris argues the term should be construed to mean: "an anode gasket for securing the anode to the cell body and providing a seal to prevent leakage of an electrolyte." (*Id*., Ex. A at 5.)

The Court refers to its construction of the term "gasket" and incorporates it herein. The second difference between the parties' proffered constructions is the type of leakage that is described, whether it is intended to connote leakage to the external environment or merely general leakage of the electrolyte. Novellus cites the section of the patent entitled "Features of the Present Invention" for the proposition the leakage must be from or to the external environment because the patent features include that the "system is sealed and minimizes external contamination electrolyte [sic] and evaporation." ('749 Patent at 12:36-37.) Poris contends that the term itself does not refer to leakage outside of the container for electrodeposition, but only to leakage of electrolyte in general. The patent specification only indicates that "[t]he anode gasket seals to the cell body preventing leakage of the electrolyte." ('749 Patent at 8:52-53.) There is no indication from either the specification or from the claim language alone that the term refers to the prevention of electrolyte to the external environment, rather than within the apparatus.

8

Accordingly, the Court construes the term "anode gasket for sealing said anode to said cell body adapted to prevent leakage of an electrolyte" to mean: "an anode gasket for securing the anode to the cell body and providing a seal to prevent leakage of an electrolyte."

**5.   "a cathode gasket for sealing said semiconductor to said cell body adapted to prevent leakage of said electrolyte and providing contact between said cathode wire and said electrically conducting layer"**

Novellus argues that the term "a cathode gasket for sealing said semiconductor to said cell body adapted to prevent leakage of said electrolyte and providing contact between said cathode wire and said electrically conducting layer" should be construed to mean: "an inert, compressible material that seals the junction between a first stationary surface that is the cell body and a second stationary surface that is the semiconductor to prevent leakage of the electrolyte between the two surfaces to the environment external to the container that hold the electrolyte during electrodeposition." (Statement, Ex. B at 2.)  Poris, on the other hand, argues that the term "a cathode gasket for sealing said semiconductor to said cell body adapted to prevent leakage of said electrolyte and providing contact between said cathode wire and said electrically conducting layer" should be construed to mean: "a cathode gasket (1) for securing the semiconductor to the cell body; (2) providing a seal to prevent leakage of the electrolyte; and (3) facilitating electrical contact between the cathode wire and the electrically conducting layer." (*Id.*, Ex. A at 5-7.)

For the same reasons, the Court adopts Poris's proposed construction for gasket, leakage, and with direct electrical contact.

Accordingly, the Court construes the term "a cathode gasket for sealing said semiconductor to said cell body adapted to prevent leakage of said electrolyte and providing contact between said cathode wire and said electrically conducting layer" to mean: "a cathode gasket (1) for securing the semiconductor to the cell body; (2) providing a seal to prevent leakage of the electrolyte; and (3) facilitating direct electrical contact between the cathode wire and the electrically conducting layer."

### 6. "means for securing said semiconductor to said cathode gasket to exclude said electrolyte from contacting said cathode wire"

The parties agree that this term is a means-plus-function term that must be construed under 35 U.S.C. § 112 ¶ 6, which permits a patentee to define a particular function in the claim and a corresponding structure in the specification. *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000). Construction of a means-plus-function claim involves a two-step process. *Medical Instrumentation & Diagnostics Corp. v. Elektra AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). In the first step, the Court must identify the particular claimed function. *Id*. In the second step, the Court looks to the specification and identifies the structure that corresponds to that function. *Id*. A structure is a "corresponding structure" only if that element is necessary to perform the function recited in the claim and is clearly linked to that function by the disclosure in the specification. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001). The patentee's "duty to clearly link or associate structure to the claimed function" represents the fair exchange for the convenience of employing means-plus-function claim limitations. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001).

Novellus argues that the term "means for securing said semiconductor to said cathode gasket to exclude said electrolyte from contacting said cathode wire" should be construed to mean: "a semiconductor wafer clamp that applies a uniform pressure to the entire back surface of the semiconductor, for securing the semiconductor to the cathode gasket to exclude the electrolyte from contacting the cathode wire." (Statement, Ex. B at 2-3.) Poris, on the other hand, argues that the term "means for securing said semiconductor to said cathode gasket to exclude said electrolyte from contacting said cathode wire" should be construed to mean: "a wafer clamp which secures the semiconductor to the cathode gasket by applying pressure to the backside of the semiconductor to exclude the electrolyte from contracting the cathode wire." (*Id.*, Ex. A at 8-9.)

The differences between the parties' proposed constructions is (1) the addition of the redundant word semiconductor, which Novellus agrees to eliminate from its proposal; (2) the addition of the descriptive term "uniform" to the pressure applied; and (3) the addition of the

descriptive term "entire" to back surface of the semiconductor. Poris agreed that the specifications require the addition of "uniform." (*See* '749 Patent at 9:51-56.) However, the Court finds no support in the patent for the proposition that the "entire" back surface of the wafer must be included.

Accordingly, the Court construes the term "means for securing said semiconductor to said cathode gasket to exclude said electrolyte from contacting said cathode wire" to mean: "a wafer clamp which secures the semiconductor to the cathode gasket by applying uniform pressure to the backside of the semiconductor to exclude the electrolyte from contracting the cathode wire."

### 7. "means for exposing a selected area of said semiconductor to said electrolyte"

Again, the parties agree that this term is a means-plus-function term that must be construed under 35 U.S.C. § 112 ¶ 6. Novellus argues that the term "means for exposing a selected area of said semiconductor to said electrolyte" should be construed to mean: "a photoresist pattern that covers the nucleating layer/diffusion barrier of the semiconductor, for exposing a selected area of the semiconductor to the electrolyte." (Statement, Ex. B at 3.) Poris, on the other hand, argues that the term "means for exposing a selected area of said semiconductor to said electrolyte" should be construed to mean: "an active side of the semiconductor having a selected area which is bounded by the cathode gasket when the semiconductor is secured against the cathode gasket for exposing the selected area of the semiconductor to the electrolyte." (*Id.*, Ex. A at 10.)

The parties agree that this means-plus-function claim has the function "for exposing the selected area of the semiconductor to the electrolyte." The difference between the parties is found in their proposed structures corresponding to that function. Novellus advocates including the single embodiment of a photoresist pattern that covers the nucleating layer/diffusion barrier of the semiconductor. Poris, on the other hand, proposes merely that the construction should include the active side of the wafer encircled by the cathode gasket that is exposed to the

11

electrolyte. The active side being defined as the side to be plated that faces the gasket and is exposed to the electrolyte. (*See* '749 Patent at 9:32-38.)

Although the patent describes an embodiment that includes the area on the active side of the semiconductor to be selectively bounded by the pattern of photoresist on the nucleating layer/diffusion barrier of the semiconductor, there is no indication that this preferred embodiment must always define the selected area. Within the area prescribed by the cathode gasket, a pattern of photoresist may further select the area actually plated, or potentially may not be present at all.

Accordingly, the Court construes the term "means for securing said semiconductor to said cathode gasket to exclude said electrolyte from contacting said cathode wire" to mean: "an active side of the semiconductor exposed to the electrolyte and having a selected area which is bounded by the cathode gasket when the semiconductor is secured against the cathode gasket for exposing the selected area of the semiconductor to the electrolyte."

### 8. "virtual anode"

Novellus argues that the term "virtual anode" should be construed in conjunction with term 9 to mean: "a metal plate having an aperture." (Statement, Ex. B at 3.) Poris argues that the term "virtual anode" should be construed to mean: "a structure configured to manipulate the current distribution between the anode and the semiconductor." (*Id.*, Ex. A at 10-11.)

In the '749 Patent, Poris did elect to be his own lexicographer by clearly setting out the definition of this term. *See Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003). In the abstract, the patent reads, in pertinent part, "A more uniform metal disposition is created by a virtual anode, i.e., a metal plate having an aperture and being located between the anode and the cathode." ('749 Patent at Abstract.) The use of "i.e.," signals the patentee's "intent to define the word to which it refers." *Edwards Lifesciences*, 582 F.3d at 1334.

Accordingly, the Court construes the term "virtual anode" to mean: "a metal plate having an aperture and that is located between the anode and the semiconductor."

12

9. **"a virtual anode located between said anode and said electrically conducting layer for creating a more uniform current distribution to said electrically conducting layer"**

Novellus argues that the term "a virtual anode located between said anode and said electrically conducting layer for creating a more uniform current distribution to said electrically conducting layer" should be construed to mean: "A metal plate having an aperture that is located between the anode and the semiconductor. The virtual anode creates a more uniform primary current distribution to the electrically conducting layer of the semiconductor." (Statement, Ex. B at 3.) Poris, on the other hand, argues that the term "a virtual anode located between said anode and said electrically conducting layer for creating a more uniform current distribution to said electrically conducting layer" should be construed to include his definition of virtual anode and that the rest of the term requires no additional construction. Accordingly, Poris contends the term should be construed to mean: "a structure configured to manipulate the current distribution between the anode and the semiconductor located between said anode and said electrically conducting layer for creating a more uniform current distribution to said electrically conducting layer." (*Id.*, Ex. A at 12-13.)

The Court adopts its construction of the term "virtual anode" and incorporates it within the construction of this term. The description of the function follows the language of the claim term, without the additional restriction proposed by Novellus that the current be primary, as such a restriction does not appear in the patent.

Accordingly, the Court construes the term "a virtual anode located between said anode and said electrically conducting layer for creating a more uniform current distribution to said electrically conducting layer" to mean: "a metal plate having an aperture and that is located between the anode and the semiconductor. The virtual anode creates a more uniform current distribution to the electrically conducting layer of the semiconductor."

10. **"a virtual anode gasket for sealing said virtual anode to said cell body to [sic] adapted to prevent leakage of said electrolyte"**

Novellus argues that the term "a virtual anode gasket for sealing said virtual anode to said cell body to [sic] adapted to prevent leakage of said electrolyte" should be construed to

13

mean: "an inert, compressible material that seals the junction between a first stationary surface that is the cell body and a second stationary surface that is the virtual anode to prevent leakage of the electrolyte between the two surfaces to the environment external to the container that holds the electrolyte during electrodeposition." (Statement, Ex. B at 4.) Poris, on the other hand, argues that the term "a virtual anode gasket for sealing said virtual anode to said cell body to [sic] adapted to prevent leakage of said electrolyte" should be construed to mean: "a gasket for securing the virtual anode to the cell body and providing a seal which prevents the electrolyte between the two surfaces to the environment external to the container that holds the electrolyte during electrodeposition." (*Id.*, Ex. A at 13-14.)

The Court adopts its previous constructions and incorporates those within the construction of this term. Again, there is no indication from either the specification or from the claim language alone that the term refers to the prevention of electrolyte to the external environment, rather than within the apparatus.

Accordingly, the Court construes the term "a virtual anode gasket for sealing said virtual anode to said cell body to [sic] adapted to prevent leakage of said electrolyte" to mean: "a gasket for securing the virtual anode to the cell body and providing a fluid-tight sealing relationship between the two surfaces to prevent leakage of the electrolyte."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms. The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than August 29, 2011.

**IT IS SO ORDERED.**

Dated: August 3, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE